IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs November 6, 2018

**STATE OF TENNESSEE v. CHRISTOPHER SWIFT**

**Appeal from the Criminal Court for Shelby County**
**No. 11-04531     James C. Beasley, Jr., Judge**

_____

**No. W2018-00054-CCA-R3-CD**

_____

The Defendant, Christopher Swift, was convicted by a jury of first degree premeditated murder; attempted first degree murder, a Class A felony; and employment of a firearm during the commission of a dangerous felony; a Class C felony.[1] See Tenn. Code Ann. §§ 39-12-101, -13-202, -17-1324.  The trial court later imposed a total effective sentence of life plus twenty-six years.  On appeal, the Defendant contends that (1) the evidence was insufficient to sustain the Defendant's conviction for first degree premeditated murder; (2) the trial court abused its discretion in denying the Defendant's motion to disqualify one of the prosecutors; (3) African-Americans were improperly excluded from the jury venire; (4) the State "intentionally mislead [the] jury" during the examination of one of its witnesses; (5) the trial court erred by allowing the admission of hearsay; (6) the trial court erred by allowing the jury to review transcripts of recorded jail phone calls as those recordings were played; (7) the State improperly displayed photographic exhibits during its closing argument; (8) the State withheld evidence; and (9) a new trial is warranted due to cumulative error.[2]  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

John Charles Catmur, Jr. (on appeal); Charles Scott Mitchell V (at trial); and Gregory David Allen (at trial), Memphis, Tennessee, for the appellant, Christopher Swift.

_____

[1] The Defendant was initially tried along with a co-defendant and convicted of the same offenses. However, this court reversed those convictions and remanded the Defendant's case for a new trial.  See State v. Christopher Swift & Marquavious Houston, No. W2013-00842-CCA-R3-CD, 2015 WL 2128782, at *1 (Tenn. Crim. App. May 5, 2015).  The Defendant's retrial is the subject of this appeal.

[2] We have reordered and renumbered the issues as they appear in the Defendant's brief for clarity.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Pamela Stark and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND[3]

This case arises from the shooting of Marco Blockmon and Demarus Smith by the Defendant and co-defendant Marquavious Houston in Memphis on January 17, 2011. Mr. Blockmon lived with his mother, Gertrude Bolden, and "worked on cars." Mr. Blockmon had agreed to work on co-defendant Houston's black Camaro, but he "hadn't gotten around to" it. The car had been at Ms. Bolden's house for "a couple of weeks" prior to the shooting. In the days leading up to the shooting, co-defendant Houston had come to Ms. Bolden's house three times looking for Mr. Blockmon. Co-defendant Houston was "calm" the first time. The second time, co-defendant Houston was a "little agitated" and "was loud, real loud, cursing." The third time, co-defendant Houston "was kind of aggressive and kind of loud." Mr. Blockmon and Mr. Smith were shot "[a] couple of days" after co-defendant Houston's third visit.

At trial, Mr. Smith testified that he picked up Mr. Blockmon from Ms. Bolden's house around 11:30 a.m. on January 17, 2011. Mr. Blockmon was going to work on Mr. Smith's red Crown Victoria so the car would "pass inspection." Mr. Smith recalled that they first stopped to get a tool Mr. Blockmon needed. While Mr. Blockmon was getting the tool, Mr. Smith received a phone call from co-defendant Houston, who Mr. Smith knew by the nickname "Quay Quay." Mr. Smith did not answer the phone, and co-defendant Houston left a voicemail. Mr. Smith did not immediately check the voicemail. When Mr. Blockmon returned from getting the tool, Mr. Smith told him about co-defendant Houston's call. Mr. Blockmon said that "he didn't want to talk to" co-defendant Houston. Mr. Smith testified that he listened to the voicemail sometime after the shooting and that co-defendant Houston had left a "very angry and threatening" message.

Mr. Smith then began to drive to the location where Mr. Blockmon was going to work on his car. Mr. Smith testified that as he was stopped at a stop sign, "a green Saturn" pulled up next to his car "on the wrong side of the street."[4] According to Mr. Smith, co-defendant Houston was driving the green Saturn and the Defendant, who Mr.

---

[3] This section will address the factual background of the Defendant's convictions. The factual background of the Defendant's procedural issues will be discussed in the relevant portions of our analysis.

[4] It was later revealed that the Saturn belonged to co-defendant Houston's girlfriend.

Smith knew by the nickname "Jerry Lawler," was in the passenger seat. Co-defendant Houston asked Mr. Smith if he knew where Mr. Blockmon was. Mr. Smith explained that Mr. Blockmon "was laid back in the seat" so that co-defendant Houston did not see him. Mr. Smith told co-defendant Houston that Mr. Blockmon "was sitting on the side of" him. Co-defendant Houston asked Mr. Blockmon if he "was . . . going to work on [co-defendant Houston's] car," and Mr. Blockmon responded that "he was going to do it, but he wasn't going to do it right now." Mr. Smith started to drive away. Mr. Smith heard the Defendant say something, but he could not make out what it was.

Mr. Smith estimated that some "five or ten seconds" later, "shots were fired." In his rearview mirror, Mr. Smith saw co-defendant Houston and the Defendant shooting at his car. Mr. Smith recalled that co-defendant Houston had a handgun and the Defendant was "hanging out the window with [an] assault rifle." Mr. Blockmon "said he had been hit." Mr. Smith tried to drive away and get Mr. Blockmon to a hospital, but the wheels of his car started spinning because the road was wet. While Mr. Smith attempted to flee, the Defendant and co-defendant Houston were "still firing." Mr. Smith then "felt the first bullet in the lower part of [his] back, and . . . [his] legs and stuff [went] numb." Mr. Smith's car crashed between a fire hydrant and a telephone pole. After the car crashed, the Defendant and co-defendant Houston "pulled on upon the side of [the car] and continued shooting." They shot at Mr. Smith's car "about four more times" before driving away.

Mr. Blockmon started "[c]oughing up blood." At that point, Mr. Smith "knew [Mr. Blockmon] was gone." Mr. Smith called his wife, who called 911. The first officers responded to the shooting between 1:30 and 1:50 p.m. Mr. Smith told responding officers that "he had been shot and that he was unable to move." When asked by the officer who shot him, Mr. Smith said "that he was being chased down . . . by Quay Quay and Jerry Lawler and that they were in a blue Saturn." Mr. Smith was taken to a hospital. Mr. Smith told a detective just before he went to surgery that "Quay Quay and Jerry Lawler" were the shooters. Mr. Smith was in surgery for fourteen hours. Mr. Smith testified at trial that he had a good view of who was shooting at his car and that he had "[n]o doubt in [his] mind" that it was the Defendant and co-defendant Houston.

After his surgery, Mr. Smith was shown two photographic lineups, and he identified the Defendant and co-defendant Houston as the shooters. Mr. Smith also spoke to detectives three days after his surgery. Mr. Smith gave a formal statement and again identified the Defendant and co-defendant Houston as the shooters. Mr. Smith testified that, in total, he has had "[f]our or five" surgeries due to the gunshot wound he suffered to his back. Mr. Smith explained that the bullet "shattered" his bladder, "punctured [his] kidney, shattered pieces of [his] spine," and caused an infection. Mr. Smith estimated that he spent a total of forty-five to fifty days in the hospital.

After he returned home from the hospital, Mr. Smith received a phone call from the Defendant. Mr. Smith testified that the Defendant asked him if he had "receive[d] anything like some money or whatnot," and that he told the Defendant that he "hadn't received anything and hung up the phone." Mr. Smith denied ever asking the Defendant's family for money. Mr. Smith's estranged wife, Shurvonder Smith, testified that she was approached by a man named Derrick at the hospital who "wanted [her] to know that they wanted to offer [Mr. Smith] some money not to testify or go to court." According to Ms. Smith, "several offers were made to" Mr. Smith. Ms. Smith testified that she overheard a phone call during which Mr. Smith was offered $10,000 "not to turn in Quay Quay and Jerry Lawler." Ms. Smith asserted that Mr. Smith never accepted any of these offers.

An autopsy was performed on Mr. Blockmon's body by Doctor Miguel Laboy, an expert in forensic pathology. Mr. Blockmon suffered a gunshot wound of indeterminate range to his "left back." The bullet traveled "from back to front and slightly left to right." The bullet fractured one of Mr. Blockmon's ribs, perforated his left lung, and lacerated his heart. Dr. Laboy found "pieces of bullet embedded in the muscle of [Mr. Blockmon's] heart." Mr. Blockmon also suffered a gunshot wound to his right forearm that fractured his radius. Additionally, Dr. Laboy found "multiple lacerations and abrasions on the shoulder, back[,] and left leg from small fragments of metallic material." The toxicology report revealed the presence of "cannabinoids" in Mr. Blockmon's system at the time of his death. Dr. Laboy opined that Mr. Blockmon's manner of death was homicide with the cause of death being "gunshot wound[s] to the back and right arm."

There were approximately eleven bullet holes in the exterior of Mr. Smith's car. Additionally, the rear driver side window and the rear passenger side tire were shot out. Police investigators recovered a bullet fragment on the car's dashboard by the steering wheel and a second bullet fragment from the rear passenger side tire. The investigators also found seven cartridge casings and a third bullet fragment in the street near Mr. Smith's car. An additional bullet fragment was recovered from Mr. Blockmon's jacket during the autopsy of his body. Later forensic testing on the cartridge casings and bullet fragments by the Tennessee Bureau of Investigation revealed that they were all 7.62x39mm caliber and had been fired by the same gun. 7.62x39mm caliber ammunition is typically used in assault rifles such as an AK-47. Investigators were never able to recover the weapons used in the shooting.

Recordings of the Defendant's jail phone calls from March 14, 23, and 24, 2011, were played for the jury. In the recordings, the Defendant discussed the fact that if Mr. Smith did not testify, then his case would likely be dismissed. The Defendant also instructed several people to call Mr. Smith and offer him money not to testify. A recording of the Defendant's March 15, 2011 jail phone calls was also played for the

jury. In that recording, the Defendant called Mr. Smith and asked him if "Bo" had contacted him. When Mr. Smith said no one had called him, the Defendant told Mr. Smith that he would "make sure" someone called Mr. Smith. The Defendant then called "Bo" and instructed "Bo" to call Mr. Smith and "[g]ive him the money."

The Defendant's uncle, Leotha Williams, testified on the Defendant's behalf at trial. Mr. Williams testified that on January 17, 2011, the Defendant lived with him and that the Defendant spent the day with the Defendant's girlfriend in Mr. Williams's apartment. Mr. Williams claimed that the Defendant and his girlfriend did not leave the apartment until 1:00 or 2:00 p.m. that afternoon. Mr. Williams asserted that he remembered that day because it was Martin Luther King Jr. Day and that the Defendant celebrated the day "like [it was] his birthday" because the Defendant "tried to live like that."

Brittany Junious testified that on January 17, 2011, she was the Defendant's girlfriend. Ms. Junious claimed that she spent the day with the Defendant in Mr. Williams's apartment "[s]itting around playing [d]ominoes, watching TV," and that they did not leave the apartment until after 4:00 p.m. that day. Mr. Junious admitted that she had a federal conviction from 2016 for conspiracy to possess marijuana.

Based upon the foregoing, the jury convicted the Defendant as charged of first degree premeditated murder, attempted first degree murder, and employment of a firearm during the commission of a dangerous felony. The trial court later imposed a total effective sentence of life plus twenty-six years. The Defendant now appeals to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his conviction for first degree premeditated murder. The Defendant argues that the State failed to prove the element of premeditation and that the jury "infer[red] premeditation from the circumstances of the murder." The State responds that the evidence was sufficient to sustain the Defendant's conviction for first degree premeditated murder.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984);

State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon

upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

Contrary to the assertion in the Defendant's brief, "Tennessee cases have long recognized that premeditation may be proved by circumstantial evidence" because "premeditation involves the defendant's state of mind, concerning which there is often no direct evidence." Davidson, 121 S.W.3d at 614-15. Here, the evidence of premeditation was overwhelming. Co-defendant Houston had grown increasingly angry at the fact that Mr. Blockmon had not fixed his car. Immediately before the shooting, co-defendant Houston called Mr. Smith looking for Mr. Blockmon and left a "very angry and threatening" message. Co-defendant Houston and the Defendant saw Mr. Smith's car at a stop sign and pulled up next to it "on the wrong side of the street" to confront Mr. Smith and Mr. Blockmon. When Mr. Blockmon said that he was not going to fix co-defendant Houston's car "right now," the Defendant said something that Mr. Smith could not hear as Mr. Smith drove away.

A few seconds later, co-defendant Houston and the Defendant began shooting at Mr. Smith and Mr. Blockmon. Co-defendant Houston was using a handgun while the Defendant was "hanging out the window with [an] assault rifle." Co-defendant Houston and the Defendant continued to fire upon Mr. Smith and Mr. Blockmon as they attempted to flee. Mr. Smith was eventually struck by a bullet, went "numb," and crashed his car. Co-defendant Houston and the Defendant pulled up beside the car and continued shooting. They then drove away, leaving Mr. Blockmon dead and Mr. Smith wounded and unable to get out of the car. After being arrested, the Defendant contacted Mr. Smith and had others contact Mr. Smith offering to pay him not to testify. We conclude that there was sufficient circumstantial evidence to establish the element of premeditation. Accordingly, the evidence was sufficient to sustain the Defendant's conviction for first degree premeditated murder.

## II. Disqualification of the Prosecutor

The Defendant contends that the trial court abused its discretion in denying his motion to disqualify one of the prosecutors, Assistant District Attorney General Pamela Stark. After the Defendant's first trial, Ms. Stark testified at a sentencing hearing for Mr. Smith. The Defendant argues that this constituted an actual conflict of interest or created an appearance of impropriety. The Defendant further argues that Ms. Stark's testimony

on behalf of Mr. Smith made her a necessary witness at the Defendant's retrial. The State responds that the trial court did not abuse its discretion in denying the Defendant's motion to disqualify Ms. Stark.

Prior to retrial, the Defendant filed a motion to disqualify Ms. Stark because she had testified at a sentencing hearing for Mr. Smith. At the hearing on the Defendant's motion, Ms. Stark asserted that the sentencing hearing occurred after Mr. Smith had testified at the first trial and the Defendant had been convicted. Ms. Stark further asserted that Mr. Smith never asked her to testify at his sentencing hearing and that she was unaware that Mr. Smith's case was pending when Mr. Smith testified at the Defendant's original trial. According to Ms. Stark, she was asked by Mr. Smith's attorney to testify at the sentencing hearing and she agreed to as a professional courtesy. Ms. Stark asserted that she played no role in Mr. Smith's plea negotiations with the State and that she did not request any particular sentence for Mr. Smith. Ms. Stark further asserted that her testimony at Mr. Smith's sentencing hearing was limited to the facts of this case and that Mr. Smith testified at the original trial despite being threatened and offered money not to. The trial court denied the Defendant's motion, concluding that Ms. Stark's testimony did not create a conflict of interest and that the Defendant could cross-examine Mr. Smith about any favorable treatment he received from the State.

At retrial, Mr. Smith admitted that he had numerous prior felony convictions. Mr. Smith was convicted of drug possession "third offense" in the early 2000s. Around the same time, Mr. Smith was also convicted of reckless homicide and two counts of attempted voluntary manslaughter. In 2010, Mr. Smith pled guilty to "a felony marijuana charge" and received a sentence of three years' probation. In December 2010, Mr. Smith was arrested for felony cocaine possession. Mr. Smith was again arrested for felony cocaine possession in July 2011. Mr. Smith testified that his probation for his 2010 marijuana conviction was revoked as a result of the cocaine possession charges and that he "went into custody and did [sixteen] and a half months." Mr. Smith pled guilty to the two cocaine charges in 2012 and received a total effective sentence of six years' probation. Finally, Mr. Smith pled guilty to being a convicted felon in possession of a firearm in 2016 and received another six-year probationary sentence.

Mr. Smith denied that his testimony was "for sale" or that he was "hoping to gain a benefit from . . . the State of Tennessee with [his] testimony." Mr. Smith admitted that Ms. Stark testified at his sentencing hearing for his 2012 cocaine possession convictions. However, Mr. Smith claimed that he did not ask her to testify at his sentencing hearing and that he did not know that she was going to testify "until she walked through the door." Mr. Smith testified that he never asked for a deal from the State, that he was never promised a deal with the State, and that he did not tell Ms. Stark about the then pending cocaine charges because "it was none . . . of [her] business to know that."

Mr. Smith further testified that he had been in jail serving his sentence for his marijuana possession conviction until just before he testified at the original trial.[5] Mr. Smith's sentencing hearing occurred after his testimony in the original trial. Mr. Smith was asked on cross-examination about specific portions of Ms. Stark's testimony at his sentencing hearing. Mr. Smith admitted that his probation for the 2012 cocaine possession convictions was never violated and that he had served no jail time on those convictions despite his being convicted of a new offense and being arrested on two other charges. However, Mr. Smith testified that there was a probation violation warrant pending at the time of trial.[6]

"In determining whether to disqualify an attorney in a criminal case, the trial court must first determine whether the party questioning the propriety of the representation met its burden of showing that there [was] an actual conflict of interest." State v. White, 114 S.W.3d 469, 476 (Tenn. 2003). In the absence of an actual conflict of interest, the trial court must also "consider whether [the] conduct has created an appearance of impropriety" necessitating disqualification of the attorney. State v. Culbreath, 30 S.W.3d 309, 312-13 (Tenn. 2000). We review a trial court's ruling on a motion to disqualify an attorney for an abuse of discretion. White, 114 S.W.3d at 475.

An actual conflict of interest "includes any circumstances in which an attorney cannot exercise his or her independent professional judgment free of 'compromising interests and loyalties,'" such as an attorney with multiple employers that are likely to cause the attorney to represent "differing interests." White, 114 S.W.3d at 476. An actual conflict of interest would also exist when an attorney has been previously exposed "to confidential case-related communications" involving the opposing party. State v. Tate, 925 S.W.2d 548, 554 (Tenn. Crim. App. 1995). There is no evidence that Ms. Stark's testifying at Mr. Smith's sentencing hearing affected her ability to exercise her independent professional judgment with respect to the Defendant's case or gave her access to confidential case-related materials. Accordingly, we concluded that Ms. Stark's actions did not create an actual conflict of interest.

An appearance of impropriety exists "'in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the . . . representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.'" White, 114 S.W.3d at 477 (alteration in original) (quoting

---

[5] The jury was made aware that there were prior proceedings in this case, but not that the Defendant had been previously tried on these charges.

[6] At the Defendant's motion for new trial hearing, Ms. Stark asserted that she had been subpoenaed to testify at a sentencing hearing for Mr. Smith in federal court and at a bond hearing in state court. However, this does not affect our analysis of the issue as these are matters that occurred after the Defendant's trial and conviction.

Clinard v. Blackwood, 46 S.W.3d 177, 187 (Tenn. 2001)). Here, Ms. Stark testified at a sentencing hearing for Mr. Smith after the Defendant's first trial and conviction. Mr. Smith's case, the 2012 cocaine possession charges, was unrelated to the Defendant's case. Ms. Stark was originally unaware of Mr. Smith's charges, took no part in his plea negotiations, and did not request any particular sentence for Mr. Smith. Instead, Ms. Stark's testimony was limited to the facts of this case and Mr. Smith's role as a witness at the Defendant's first trial. As such, we conclude that Ms. Stark's actions did not create an appearance of impropriety that would require her disqualification from the Defendant's retrial.

Tennessee Rule of Professional Conduct 3.7 provides that "[a] lawyer shall not act as an advocate at a trial in which the lawyer is likely to be a necessary witness . . . ." Tenn. R. Sup. Ct. Rule 8, RPC 3.7(a). However, a lawyer is not a necessary witness "if the substance of their testimony can be elicited from other witnesses." State v. Rebecca Michelle Spears, Alias, No. E2017-01836-CCA-R9-CD, 2018 WL 3528315, at *4 (Tenn. Crim. App. July 23, 2018) (internal quotation marks omitted) (quoting People v. Tesen, 739 N.W.2d 689, 698 (Mich. Ct. App. 2007)). Here, Mr. Smith was thoroughly cross-examined about his criminal record, about the fact that he received multiple alternative sentences since his testimony in the first trial, about Ms. Stark's testimony at his sentencing hearing for the 2012 cocaine possession convictions, and about the fact that his probation for those convictions was never violated despite his having been convicted of a new offense and arrested multiple times. Therefore, Ms. Stark was not a necessary witness in the Defendant's retrial. Accordingly, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion to disqualify Ms. Stark.

### III. Racial Composition of the Jury Venire

The Defendant contends that African-Americans were improperly excluded from the jury venire. The Defendant argues that only six "of the forty-five members" of the jury venire were African-Americans and that this is out of proportion with the African-American population of Shelby County. The State responds that the Defendant has waived this issue by failing to make appropriate references to the record and providing no citations to support "the figures that he presents with regard to . . . the Shelby County population."

The Defendant has waived plenary review of this issue by failing to make appropriate references to the record to support his factual allegations. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by . . . appropriate references to the record will be treated as waived in this court"). Additionally, the only references to the racial composition of the jury venire are statements made by defense counsel in his motion for new trial and at the motion for new trial hearing. Defense counsel's assertions

are "no substitute for a properly developed record." State v. Hugh Williams, No. 02C01-9209-CR-00220, 1994 WL 553420, at *7 (Tenn. Crim. App. Oct. 12, 1994). Accordingly, we review this issue solely for plain error.

The doctrine of plain error applies when all five of the following elements have been established:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

State v. Minor, 546 S.W.3d 59, 67 (Tenn. 2018). A defendant's failure to establish any of these criteria requires denial of relief under the plain error doctrine, and "an appellate court need not consider all criteria when the record demonstrates that one of them cannot be established." Id. "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." State v. Page, 184 S.W.3d 223, 231 (Tenn. 2006).

Plain error relief for this issue is not warranted because the Defendant has failed to establish that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. "[S]election of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial." State v. Bell, 745 S.W.2d 858, 860 (Tenn. 1988). In order to establish a prima facie violation of this requirement, a defendant must show "1) that the allegedly excluded group is a distinctive group in the community; 2) that its representation on the venire is not fair and reasonable in relation to its numbers in the community; and 3) that the under representation resulted from systematic exclusion." State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989) (citing Duren v. Mississippi, 439 U.S. 357, 364 (1979)).

As noted above, the record contains no evidence regarding the racial composition of the jury venire or how representative it was in relation to the population of Shelby County. Moreover, the Defendant concedes in his brief that he has no proof that the method used in Shelby County to select jury venires "systematically excludes . . . African-Americans." As such, the Defendant has failed to establish a prima facie violation. Accordingly, we conclude that plain error relief for this issue is not warranted.

## IV. "Misleading" the Jury

The Defendant contends that the State "intentionally misled the jury" when the prosecutor "elicited testimony that [Mr. Smith]" had previously served "sixteen months"

-11-

in jail. The Defendant argues that the judgment forms for Mr. Smith's 2012 cocaine possession convictions reflect that he "was not incarcerated" and that, when asked on cross-examination, Mr. Smith stated that he had "served no jail time on two drug arrests." The State responds that the Defendant has waived this issue by failing to cite to the record or any legal authority to support his argument.

The Defendant has waived plenary review of this issue by failing to cite any legal authority to support his argument and by failing to make appropriate references to the record to support his factual allegations. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by . . . citation to authorities[] or appropriate references to the record will be treated as waived in this court"). Additionally, the Defendant failed to make a contemporaneous objection to Mr. Smith's testimony.[7] See Tenn. R. App. P. 36(a) (not requiring that relief be granted "to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As such, we review this issue solely for plain error.

Here, the Defendant has failed to establish that a substantial right of the accused was adversely affected. Minor, 546 S.W.3d at 67. When Mr. Smith testified that he had gone "into custody and did [sixteen] and a half months," he was referring to his 2010 marijuana possession conviction and not the two cocaine possession convictions from 2012. Mr. Smith's probation for his 2010 conviction was revoked as a result of the cocaine possession charges that he later pled guilty to in 2012. The Defendant provides no explanation as to why he believes that Mr. Smith's service for an earlier, unrelated conviction should have been reflected on the judgment forms for his 2012 convictions. Moreover, Mr. Smith repeatedly admitted that his probation for the 2012 cocaine possession convictions was never violated and that he served no jail time on those convictions despite his being convicted of a new offense and being arrested on two other charges. Accordingly, we conclude that plain error relief for this issue is not warranted.

## V. Hearsay

The Defendant contends that the trial court erred in allowing the admission of hearsay. The Defendant argues that Ms. Smith's testimony that she was approached by a man named Derrick who "wanted [her] to know that they wanted to offer [Mr. Smith] some money not to testify or go to court" was inadmissible hearsay. The State responds

---

[7] Mr. Smith twice mentioned that he had served "[sixteen] and a half months" during his testimony. The first statement occurred during the State's direct examination and the second statement occurred during the State's redirect examination. The Defendant makes no mention of the first statement in his brief. The Defendant alleges in his brief that trial counsel objected to the second statement and that the trial court "ruled on the objection, but there was not a curative instruction to that effect." The Defendant has provided no citation to the record to support this assertion. Our reading of the record reveals no such exchange.

that the Defendant has waived this issue by failing to make a timely objection to Ms. Smith's testimony.

Ms. Smith initially testified on direct examination that "somebody" had approached her while she was at the hospital to convey the offer to pay Mr. Smith not to identify the shooters. The Defendant did not object to this testimony. On cross-examination, defense counsel asked Ms. Smith several questions about the individual who had approached her, including if his name was Derrick, if she knew his last name, if she knew him, and if she knew who he was conveying the offer for. At a later pause in the trial proceedings, defense counsel stated that he did not object to Ms. Smith's testimony because he did not want to draw attention to it, but moved the trial court to strike her testimony as inadmissible hearsay. The trial court concluded that the Defendant's motion to strike was untimely and denied it.

Generally, failure to make a contemporaneous objection to the admission of evidence will waive plenary review of that issue. See Tenn. R. App. P. 36(a) (not requiring that relief be granted "to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Nevertheless, a motion to strike "can serve as a late objection and 'may properly be made at any time prior to the formal closing of the evidentiary record and the final resting of the case by all parties.'" State v. Jeffrey Leo Rochelle, No. M2011-02639-CCA-R3-CD, 2013 WL 285747, at *11 (Tenn. Crim. App. Jan. 25, 2013) (quoting State v. Pilkey, 776 S.W.2d 943, 952-53 (Tenn. 1989)). However, delaying the motion to strike in order to allow the Defendant to cross-examine the witness about the alleged inadmissible testimony will waive plenary review of the issue. Id. Accordingly, we review this issue solely for plain error.

At the outset, we note that "rarely will plain error review extend to an evidentiary issue." State v. Jonathan Mitchell Grimes, No. W2014-00786-CCA-R3-CD, 2015 WL 3929694, at *10 (Tenn. Crim. App. June 26, 2015) (quoting State v. Ricky E. Scoville, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007)). Here, plain error relief is not warranted because the Defendant has failed to demonstrate that the issue was not waived for tactical reasons. Minor, 546 S.W.3d at 67. In making his motion to strike, defense counsel stated that he did not object to Ms. Smith's testimony because he did not want to draw attention to it. Additionally, defense counsel thoroughly cross-examined Ms. Smith about the exchange at the hospital in an attempt to impeach her testimony. Accordingly, we conclude that plain error relief for this issue is not warranted.

## VI. Jail Phone Call Transcripts

The Defendant contends that the trial court erred by allowing the jury to review transcripts of recorded jail phone calls as those recordings were played. The Defendant argues that the transcripts were inaccurate because they were not made by "a professional court reporter or a transcriptionist" and because "both parties could not agree on what was being said in the recorded phone call[s]." The State responds that the trial court properly instructed the jury on the use of the transcripts and did not err in allowing the jury to review them while the recordings were played.

Prior to the admission of the Defendant's recorded jail phone calls, defense counsel objected to the transcripts provided by the State. Defense counsel argued that the transcripts did not accurately reflect what was on the recordings and that the jury would rely on the transcripts rather than listening to the recordings. The trial court reviewed the recordings and the transcripts with the parties. Defense counsel objected to two instances of the word "s--t." The trial court stated that it did not think the use of the word "s--t" would change the context of what was being said on the recording and overruled defense counsel's objections. At that point, defense counsel stated that there was no need to continue reviewing the transcripts because the rest of his objections would have been similar to the previous two. Prior to the recordings being played, the trial court instructed the jury that the recordings, and not the transcripts, were the actual evidence. After the recordings were played, the transcripts were taken from the jury, and the trial court again instructed them that the transcripts were not evidence.

"It is well-settled in Tennessee that a transcript of a [recording] may be given to a jury [when] the jury is instructed that the [recording], and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994). Here, the trial court properly instructed the jury that the recordings were the actual evidence and that the transcripts were not. We are aware of no legal authority that requires a transcript to be made by "a professional court reporter or a transcriptionist" before it can be given to a jury, and the Defendant cites no such authority in his brief to support his argument. Moreover, Tennessee law does not require the trial court to "authenticate" a transcript "when there is a dispute concerning the transcript[']s accuracy before it may be used by the jury." State v. Walker, 910 S.W.2d 381, 394 (Tenn. 1995). The Defendant's brief does not identify any alleged inaccuracies in the transcripts. Even if it did, the trial court was not required to "authenticate" the transcript before giving the transcript to the jury. Accordingly, we conclude that this issue is without merit.

## VII. Photographic Display During the State's Closing Argument

The Defendant contends that the State improperly displayed photographic exhibits during its closing argument. The Defendant describes the display as "a slide show of the

crime scene photographs on a loop during [the State's] closing argument." The Defendant argues that this display constituted prosecutorial misconduct. The State responds that the Defendant has waived this issue by failing to cite to the record or any legal authority to support his argument.

The Defendant has waived plenary review of this issue by failing to make a contemporaneous objection to the display. See Tenn. R. App. P. 36(a) (not requiring that relief be granted "to a party . . . who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Moreover, the Defendant's three-sentence argument in his brief contains no citations to the appellate record or legal authority. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by . . . citation to authorities[] or appropriate references to the record will be treated as waived in this court"). As such, we review this issue solely for plain error.

Plain error relief for this issue is not warranted because the record does not clearly established what occurred in the trial court. Minor, 546 S.W.3d at 67. In addition to not making a contemporaneous objection to the display, the Defendant made no offer of proof as to what photographs were shown during the "slide show." The Defendant describes the photographs as "crime scene photographs" that were displayed "on a loop during [the State's] closing argument." In denying the Defendant's motion for new trial, the trial court stated that the photographs were all trial exhibits. However, there is nothing in the record indicating which of the numerous photographs entered into evidence during the trial were displayed during the State's closing argument or how they were displayed. Accordingly, we conclude that plain error relief for this issue is not warranted.

## VIII. Withheld Evidence

The Defendant contends that the State withheld evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Specifically, the Defendant argues that the State withheld a "statement which [was] alleged [to be] a threat by the [Defendant] against [Mr.] Smith." However, the record contains no such statement by the Defendant. Based upon the citations to the record in the Defendant's brief, it appears that the Defendant is referring to the voicemail left by co-defendant Houston on the day of the shooting. The State responds that there was no Brady violation.

The Defendant has waived this issue by failing to include it in his motion for new trial. See Tenn. R. App. P. 3(e) (providing that "no issue presented for review shall be predicated upon . . . misconduct of jurors, parties or counsel . . . upon which a new trial is sought, unless the same was specifically stated in a motion for new trial, otherwise such issues will be treated as waived"). Plenary review having been waived, our review is limited to plain error.

-15-

Plain error relief for this issue is not warranted because the Defendant has failed to establish that a clear and unequivocal rule of law was breached. Minor, 546 S.W.3d at 67. A Brady violation occurs when the State suppresses evidence that is exculpatory or favorable to the Defendant. State v. Jackson, 444 S.W.3d 554, 594 (Tenn. 2014). The evidence at issue here was inculpatory because it was circumstantial evidence establishing the premeditation of the shooting.

Additionally, Tennessee courts analyze delayed disclosure differently from outright suppression, focusing on the prejudice of the delay. See State v. Twain Demario Vaughn, No. M2006-01659-CCA-R3-CD, 2008 WL 110094, at *6 (Tenn. Crim. App. Jan. 9, 2008). There is no evidence in the record before us that the Defendant was prejudiced by any delay in the disclosure of the fact that co-defendant Houston left a threatening voicemail on Mr. Smith's phone on the day of the shooting. Accordingly, we conclude that plain error relief for this issue is not warranted.

### IX. Cumulative Error

The Defendant contends that he is entitled to a new trial based upon cumulative error. The cumulative error doctrine applies to circumstances in which there have been "multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). However, circumstances which would warrant reversal of a conviction under the cumulative error doctrine "remain rare" and require that there has "been more than one actual error committed in the trial proceedings." Id. at 76-77. Having discerned no error in the trial proceedings, there can be no cumulative error. Accordingly, we conclude that this issue is without merit.

### CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-16-